

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 11, 2025

**BY ECF**
The Honorable Margaret M. Garnett
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

  Re: **United States v. Otoniel Rodriguez**, 25 Cr. 93 (MMG)

Dear Judge Garnett:

  The Government respectfully submits this letter in advance of sentencing in this matter for defendant Otoniel Rodriguez (the "defendant"), which is scheduled for September 18, 2025. On March 7, 2025, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement") to one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of mixtures or substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B). Given the seriousness of the offense and the need to deter future criminal conduct by others, the Government recommends the Court impose a sentence of 144 months' imprisonment.

  A. Overview

    i. The Offense Conduct

  Over the course of years, the defendant led a scheme that trafficked massive amounts of cocaine from California to New York.

  The defendant would source cocaine from his homebase in California and then ship kilograms of cocaine in United States Priority Mail packages to an apartment he rented in Manhattan. (PSR ¶¶ 9-10). The defendant would then direct his co-conspirator and New York roommate, Jose Aburto, to distribute the cocaine to customers. Some transactions were smaller, as low as $50,000, other multikilogram transactions could involve up to $200,000. In just one year, from February 2023 to March 2024, the defendant distributed 200 kilograms of cocaine (PSR ¶ 22), with a street value of approximately $4 million.

  The defendant was the leader of the scheme. The defendant sourced the cocaine and found and communicated with clients. (PSR ¶ 20). The defendant would direct Aburto to pick up packages of cocaine, deliver them to clients, and count and safeguard the money received. (PSR

¶ 20). In return, the defendant subsidized Aburto's rent. In the four years the defendant and Aburto worked together, the pair distributed many hundreds of kilograms of cocaine.

The defendant enriched himself with the millions of dollars he earned distributing cocaine. He opened a bar in Las Vegas. He had multiple residences across the country. He purchased a Rolex and gold chains from Cartier. He would frequent nightclubs and spend thousands of dollars nightly on bottle service. He vacationed in Paris. He drove a Rolls Royce.

    ii. Procedural History

The defendant was arrested on March 16, 2024. He has been detained since his arrest. On March 7, 2025, pursuant to the Plea Agreement, the defendant pled guilty to one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of mixtures or substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).

In the Plea Agreement, dated January 7, 2025, the parties stipulated to a United States Sentencing Guidelines (the "Guidelines") range of 210 to 262 months' imprisonment (the "Guidelines Range"), based on an Offense Level of 37 and Criminal History Category of I. (PSR ¶ 5). The United States Probation Office agrees with this calculation. (PSR ¶ 82). The mandatory-minimum sentence is 60 months' imprisonment.

**B. Discussion**

    i. Applicable Law

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596.

After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

Although the Court may not presume the reasonableness of a within-Guidelines sentence, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that,

in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

    ii.  <u>The Court Should Impose a Sentence of 144 Months' Imprisonment</u>

A below Guidelines sentence of 144 months' imprisonment is warranted in this case particularly to reflect the nature and seriousness of the offense and to promote general deterrence.

*First*, the defendant's crime was very serious. From February 2023 to March 2024, the defendant was prolific, trafficking 200 kilograms of cocaine, with a street value of approximately $4 million, to New York. In the years prior to his arrest, he trafficked hundreds of additional kilograms of cocaine. Cocaine is a highly addictive substance that destroys lives, destabilizes communities, and funds criminal organizations. Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures, respiratory failure, organ damage, and death. *See* "National Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use?" (May 2016), available at https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use. Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. For this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*, 214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

The harms posed by cocaine have only increased over time. Empirical data shows, for example, that overdose deaths involving cocaine have increased dramatically over the last two decades:



Drug Enforcement Administration, 2020 National Drug Threat Assessment ("2020 NDTA") (Mar. 2021), at 30, *available at* https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

The harm that is done by large scale cocaine trafficking is almost incalculable. "[T]he drugs at issue here cripple individuals and destroy[po] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). When the defendant engaged in the large-scale distribution of cocaine, he "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24).

The defendant was not a small player. He was the leader. He controlled all aspects of the scheme—sourcing the cocaine, finding the clients, and managing his co-conspirator, Jose Aburto. And he did all of this for one reason: to enrich himself. He made millions of dollars and lived a life of excess—exotic cars, multiple houses, jewelry, trips to Paris—all while he poisoned the streets of New York.

*Second*, a Guidelines sentence is appropriate to ensure general deterrence. A sentence of 144 months' imprisonment would send a powerful message to cocaine traffickers that they will be caught, and they will see severe consequences.

While the Government does believe a significant sentence of 144 months' imprisonment is warranted, the Government does not believe a Guidelines sentence of 210 to 262 months' imprisonment is appropriate because the defendant accepted responsibility quickly, the Government has no reason to believe the cocaine the defendant distributed was laced with deadlier narcotics such as a fentanyl, and the offense did not involve violence and/or gang activity. Leniency is appropriate, but the sentence the defendant asks for—one meaningfully below ten years—would not properly account for the massive cocaine trafficking enterprise the defendant led.[1]

### C. Conclusion

For the reasons set forth above, a sentence of 144 months' imprisonment is appropriate.

---

[1] [redacted]

        Respectfully submitted,

        JAY CLAYTON
        United States Attorney for the
        Southern District of New York


by:  /s/_____
     Adam Sowlati
     Assistant United States Attorneys
     (212) 637-2438

cc: Defense Counsel (by ECF)